# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

GLYNN COUNTY, GEORGIA,    )
by and through the    )
GLYNN COUNTY BOARD OF    )
COMMISSIONERS,    )
    )
    Plaintiff,    )
    )
    v.    )    2:22-CV-28
    )
GL NV24 SHIPPING INC.,    )
HYUNDAI GLOVIS CO.,    )
G-MARINE SERVICE CO., LTD,    )
NORTON LILLY    )
INTERNATIONAL, INC., and    )
T&T SALVAGE LLC,    )
    )
    Defendants.    )

## ORDER

This case arises from the capsize of the *M/V Golden Ray* ("Golden Ray" or "the vessel") in the Saint Simons Sound located in Glynn County, Georgia. The County filed suit for damages sustained due to the capsize against (1) the vessel's owner, GL NV24 Shipping, Inc. ("GL NV24"); (2) the vessel's charterer, Hyundai Glovis Co. ("Hyundai Glovis"); and (3) the vessel's operator and technical superintendent, G-Marine Service Co., Ltd. ("G-Marine") (collectively "Vessel Defendants"), as well as (4) the vessel's agent, Norton Lilly International, Inc. ("Norton Lilly"), and (5) the wreck removal company, T&T Salvage LLC

("T&T"). This Order addresses the Vessel Defendants' and Norton Lilly's motions to dismiss. Dkt. No. 109 (Vessel Defendants); Dkt. No. 104 (Norton Lilly).

BACKGROUND[1]

A little after 1 a.m. on September 8, 2019, the Golden Ray, a 656-foot-long car and truck carrier, left the Colonel's Island Terminal in Brunswick, Georgia, via the South Brunswick River. Dkt. No. 39 ¶¶ 1, 17.

GL NV24 owned the Golden Ray, id. ¶ 7, and Hyundai Glovis chartered and managed the vessel, id. ¶¶ 1, 8. "Hyundai Glovis's manager of ocean carrier services was the local vessel operator for Hyundai Glovis and was responsible for getting the vessel in and out of [U.S.] ports. He took over the [Golden Ray] at Freeport, Texas." Id. ¶ 30. Hyundai Glovis hired G-Marine to operate the Golden Ray, id. ¶ 31, and Norton Lilly to be the Golden Ray's agent in the Port of Brunswick, id. ¶¶ 10, 32.

Norton Lilly developed a "preliminary stowage plan" or "load plan," which indicated where vehicles would be loaded on the vessel. Id. ¶ 33. Hyundai Glovis reviewed the stowage plan "for the large-scale view of the layout[,] and Norton Lilly conducted the space calculations." Id. Norton Lilly also "developed the final

---

[1] At this stage, the Court must "accept as true all facts alleged in the non-moving party's pleading, and . . . view those facts in the light most favorable to the non-moving party." Perez v. Wells Fargo, N.A., 774 F.3d 1329, 1335 (11th Cir. 2014).

2

load plan that included the actual load conditions, including the number, the estimated weight, and the stowage location of vehicles on each deck." Id. ¶ 34. "G-Marine's safety management team was responsible for the safety management software and procedures used on the [Golden Ray] and the chief officer, employed by G-Marine, calculated stability prior to the vessel getting underway." Id. ¶ 36.

The Golden Ray carried 4,161 vehicles as it left the Port of Brunswick. Id. ¶ 2. Each vehicle's tank was 25% full of fuel. Id. ¶ 2 n.1. In total, the vessel was transporting approximately 240,000 gallons of diesel fuel and over 86,000 gallons of heavy bunker fuel. Id. ¶ 2.

The Golden Ray proceeded through St. Simons Sound, destined first for Baltimore and from there to the Middle East. Id. ¶ 17. The vessel encountered "cupcake conditions"—"light south wind, calm, good visibility, [and] bright"—in the St. Simons Sound. Id. ¶ 20.

To exit the sound, the vessel turned starboard and "headed right and east out of" the sound. Id. ¶ 21. It then became unstable and leaned starboard. Id. ¶ 22.

The Golden Ray's captain could not right the ship, and it eventually capsized portside down on the edge of the sound. Id. ¶¶ 22-24. Its starboard side protruded out of the water, facing the sky. Id. ¶ 24. "The Golden Ray was grounded in close proximity

to environmentally sensitive areas that serve as unique habitat for a variety of species, including fish, shellfish and migratory birds." Id. ¶ 40.

The vessel immediately began to leak fuel. Id. ¶ 25. "Fires broke out." Id. ¶ 26. The Golden Ray's capsize was "the largest shipwreck in the coastal United States since the Exxon Valdez in 1989." Id. ¶ 1.

Several days later, on September 23, 2019, the United States Coast Guard ("Coast Guard") reported "sporadic discharges" of oil from the ship's hull. Id. ¶ 28. According to the Coast Guard, this oil had spread to nearby shorelines, rivers, and marshes. Id. On October 1, 2019, the ship discharged more fuel, and "oil was observed on Jekyll Island beaches and nearshore waters." Id. ¶ 29.

By December 29, 2019, "thousands of gallons of fuel, mixed with water" were pumped out of the ocean as part of mitigation efforts, but "thousands of gallons of petroleum products, hazardous substances, and the 4,161 vehicles remained." Id. ¶ 41.

In January 2020, T&T accepted responsibility for the wreck removal. Id. ¶ 44. Subsequently, problems with the wreck removal occurred, including repeated fires, delay in placement of the environmental protection barrier ("EPB"), and breaking of the cutting chain used to cut the vessel into pieces. Id. ¶¶ 45-52. The "fires caus[ed] discharges of debris and hazardous fluids," id. ¶ 52, and "[s]everal substantial oil leaks from the wreck . . .

4

made it past the EPB, allowing oil to infiltrate the coastal wetlands, marshlands, estuaries, and beaches," id. ¶ 53. Salvage operations ended about nine months later, in October 2021. Id. ¶ 54.

After an investigation and hearing, the Coast Guard and the National Transportation Safety Board ("NTSB") determined that the Golden Ray "was not in compliance with the 2008 Intact Stability Code because the vessel had too much cargo at a high center of gravity, a situation that could have been corrected by ballasting." Id. ¶ 37. "[T]he [Coast Guard] and NTSB concluded that the vessel was loaded such that it had too many vehicles placed at a high center of gravity," which rendered it "top-heavy" and placed it "in danger of capsizing since its loading in Freeport, Texas." Id. ¶ 39.

In response to the capsize, the National Pollution Funds Center ("NPFC"), controlled by the Coast Guard, issued a public notice in accordance with the Oil Pollution Act of 1990 ("OPA"). Dkt. No. 109-1. The Public Notice stated, in relevant part:

> In accordance with the Oil Pollution Act of 1990 (33 USC 2714(c)), the M/V GOLDEN RAY, owned by GLNV24 Shipping, Inc., has been named as the source of a discharge of oil into Saint Simons Sound, Georgia on September 8, 2019. This spill impacted the Saint Simons Sound, Georgia and as the owner of the vessel, GLNV24 Shipping, Inc., is accepting claims for certain uncompensated damages and removal costs that resulted from the discharge. . . . Claims should be in writing, signed by the claimant, for a specified amount; and should include all evidence to support the damages. Claims presented may include claims

for interim short-term damages representing less than the full amount to which the claimant ultimately may be entitled. It should be noted that payment of such a claim shall not preclude recovery for damages not reflected in the paid or settled partial claims. Claims should be mailed to the following address:

MR & Associates, LLC, 900 Rockmead Drive, Ste. 150, Kingwood, TX 77339.

Id. at 1.

On June 7, 2021, GL NV24's agent received an OPA claim presentment from Glynn County, which was addressed only to GL NV24. Dkt. No. 44-1 at 1. On March 25, 2022, Glynn County filed suit against Vessel Defendants, Norton Lilly, and T&T Salvage. Dkt. No. 1. Defendant Norton Lilly filed a motion to dismiss. Dkt. No. 28. Glynn County then filed an amended complaint. Dkt. No. 39. Accordingly, the Court denied Norton Lilly's motion to dismiss as moot. Dkt. No. 38. Vessel Defendants and Norton Lilly then filed motions to dismiss the First Amended Complaint. Dkt. No. 44; Dkt. No. 61. After an oral hearing held in December 2022, Glynn County filed another amended complaint, dkt. no. 96, and the Court denied Defendants' motions as moot, dkt. no. 106.

In its Second Amended Complaint, Glynn County asserted the following claims:

1. Strict liability under OPA, 33 U.S.C. § 2702, against the Vessel Defendants (Count I), dkt. no. 96 ¶¶ 55-68;

2. Damages under O.C.G.A. Sections 12-5-20 through 12-5-53 against the Vessel Defendants (Count II), id. ¶¶ 69-73;

6

3. Negligence under federal maritime law against the Vessel Defendants, Norton Lilly, and T&T Salvage (Count III), id. ¶¶ 74–92;

4. Public nuisance under state law against the Vessel Defendants and Norton Lilly (Count IV), id. ¶¶ 93–122;

5. Trespass under state law against all Defendants (Count V), id. ¶¶ 123–32;

6. Private nuisance under state law against the Vessel Defendants and Norton Lilly (Count VI), id. ¶¶ 133–40;

7. Negligence and strict liability for ultrahazardous activity against T&T Salvage (Count VII), id. ¶¶ 141–51.

Subsequently, the Vessel Defendants and Norton Lilly filed motions to dismiss Glynn County's Second Amended Complaint. Dkt. No. 104; Dkt. No. 109. After further briefing and oral argument, these motions are ripe for adjudication.

## DISCUSSION

### I.   Presentment

The Vessel Defendants take issue with two aspects of Glynn County's presentment: (1) its presentment to "the responsible party," or lack thereof, 33 U.S.C. § 2713(a), and (2) the "sum certain" the County asserted, 33 U.S.C. § 2701(3). Dkt. No. 109 at 8–12. Glynn County's presentment was sufficient in both aspects.

## A. Presentment to the responsible party

The Vessel Defendants argue that Glynn County's OPA claim against them must be dismissed in its entirety for improper presentment. Dkt. No. 109 at 8–12. The OPA requires that "*all* claims for removal costs or damages shall be presented first to the *responsible party*." 33 U.S.C. § 2713(a) (emphasis added). Proper presentment under Section 2713 is a mandatory condition precedent to a plaintiff filing suit for recovery under the OPA. Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., 51 F.3d 235, 240 (11th Cir. 1995) ("We therefore hold that the clear text of § 2713 creates a mandatory condition precedent *barring all OPA claims* unless and until a claimant has presented her claims in compliance with § 2713(a) and either: (1) all responsible parties deny all liability; or (2) the claim is not settled by payment within 90 days after (A) the claim was presented, or (B) advertising was begun under section 2714(b) of the Act, whichever is later." (emphasis added)). Thus, a plaintiff's failure to comply with the OPA's presentment requirements will result in dismissal of the plaintiff's OPA claims. Id.

According to the Vessel Defendants, because Glynn County addressed its presentment letter only to GL NV24—but it acknowledges that G-Marine and Hyundai Glovis are also responsible parties—the County failed to follow Section 2713(a)'s presentment procedure. Dkt. No. 109 at 10–11; Dkt. No. 120 at 2–8. As a result,

the Vessel Defendants argue, Glynn County's OPA claims must be dismissed. Dkt. No. 109 at 10-11; Dkt. No. 120 at 2-8.

Glynn County responds that it followed the presentment instructions in the Coast Guard's public notice and that the OPA does not impose additional investigative duties upon claimants. Dkt. No. 117 at 5-11. Thus, according to the County, it complied with the OPA's presentment requirements. Id. Moreover, Glynn County argues that the Vessel Defendants are estopped from challenging the presentment's sufficiency, noting that Vessel Defendants' counsel "acknowledged in writing that the presentment was received" and "specifically stated that it represented all Vessel Defendants." Id. at 9.

To begin, the Court evaluates Glynn County's estoppel argument, as it would bar any consideration of the presentment's substantive sufficiency. Glynn County argues that the Vessel Defendants should be estopped from asserting that its presentment was insufficient because "Vessel Defendants' prior contact, response, and statements to the County after the County sent its Presentment led the County to believe that the parties accepted that its Presentment applied to all three Vessel Defendants." Dkt. No. 117 at 11.

The County's estoppel argument fails. As the Vessel Defendants note, "[a]s a matter of law, [the] OPA's presentment requirement is not subject to equitable theories like estoppel or

9

waiver" because the Eleventh Circuit has unequivocally held that the presentment requirement is jurisdictional. Dkt. No. 120 at 7-8 (first citing Russo v. M/T DUBAI STAR, No. C 09-05158 SI, 2010 WL 1753187, at *3 n.3 (N.D. Cal. Apr. 29, 2010); then citing Marathon Pipe Line Co. v. LaRoche Indus. Inc., 944 F. Supp. 476, 477 (E.D. La. 1996); then citing Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982); and then citing Hallstrom v. Tillamook Cnty., 493 U.S. 20, 21 (1989)); see also Boca Ciega Hotel, Inc., 51 F.3d at 240 ("We hold that the district court correctly interpreted § 2713(a)[, the presentment requirement,] as creating a mandatory condition precedent to bringing any claims under OPA. Consequently, the district court was correct when it granted the Appellees' motions to dismiss for lack of subject matter jurisdiction."); Russo, 2010 WL 1753187, at *3 n.3 ("OPA's rules relate to the Court's subject matter jurisdiction and are therefore not subject to waiver."); Marathon Pipe Line, 944 F. Supp. at 477 ("The Court agrees that § 2713's presentation requirement is jurisdictional and mandates dismissal when that provision is applicable and not complied with by the claimant."); Ins. Corp. of Ir., 456 U.S. at 702 ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the

proceedings." (citations omitted)). Thus, the Vessel Defendants are not estopped from arguing that Glynn County's presentment was insufficient.

The Court next examines the presentment's substance to determine whether the County satisfied the OPA's presentment requirement as to "the responsible party." 33 U.S.C. § 2713(a). "It is axiomatic that the interpretation of a statute must begin, and usually ends, with the text of the statute." Boca Ciega, 51 F.3d at 237 (citations omitted). "When interpreting the text, we give undefined terms their plain, ordinary, and most natural meaning." Id. Section 2713(a) states: "all claims for removal costs or damages shall be presented first to the responsible party or guarantor of the source designated under [S]ection 2714(a) of [the] title." Section 2713 does not explain _how_ the claims shall be presented to the responsible party.

The Vessel Defendants interpret Section 2713(a) to require a written presentment addressed to each responsible party. See Dkt. No. 109 at 8–12. This is a possible reading looking only at the text of Section 2713(a). Another possible reading is that "the responsible party" refers to the party who accepts the NPFC's designation and promulgates the advertisement. 33 U.S.C. § 2713(a). The Court, however, cannot evaluate Section 2713 in a vacuum. Instead, the Court must interpret it in context along with the other provisions of the OPA. And in doing so, it becomes

11

apparent that the Vessel Defendant's argument is not supported by the OPA's text.

To understand Section 2713 in context, it is helpful to review the creation and progression of an OPA claim prior to its presentment.

- To begin, for example, a vessel accident occurs, and it starts to discharge oil.

- The NPFC receives notice of the incident and "designates the source . . . of the discharge." 33 U.S.C. § 2714(a).[2]

- The NPFC "immediately notif[ies] the responsible party and the guarantor, if known," of the source. Id.

- Next, the notified responsible party and guarantor may accept the designation, deny the designation, or fail to inform the

_____

[2] The President delegated these functions by executive order to the Coast Guard, and the Coast Guard commissioned the NPFC to carry them out. Exec. Order. No. 12777, 56 F.R. 54757 § 7(d)(2) (Oct. 18, 1991) ("The functions vested in the President by Section 1014 of OPA, respecting designation of sources of discharges or threats, notification to responsible parties, promulgation of regulations respecting advertisements, the advertisement of designation, and notification of claims procedures, are delegated to the Secretary of the Department in which the Coast Guard is operating."); 40 C.F.R. § 300.14 ("The NPFC is responsible for implementing those portions of Title I of the OPA that have been delegated to the Secretary of the department in which the Coast Guard is operating. The NPFC is responsible for addressing funding issues arising from discharges and threats of discharges of oil.").

NPFC of its denial within five days after receiving notification of its designation. Id. § 2714(b)(1).

- If the responsible party accepts responsibility or fails to inform the NPFC of its denial within five days, the party "shall advertise the designation and the procedures by which claims may be presented, in accordance with regulations promulgated by the President." Id.; see also 33 C.F.R. § 136.309 ("If a responsible party or guarantor has not denied designation . . . the party or guarantor shall advertise, in accordance with the requirements of this subpart, the designation and the procedures by which claims may be presented.").

  o If the party fails to advertise, "the [NPFC] shall promptly and at the expense of the responsible party or the guarantor involved, advertise the designation and the procedures by which claims may be presented to the responsible party or guarantor." 33 U.S.C. § 2714(a).

- If the parties deny the designation, "the [NPFC] shall advertise or otherwise notify potential claimants of the procedures by which claims may be presented to the Fund." Id. § 2714(c); see also id. § 2701(11) ("'Fund' means the Oil Spill Liability Trust Fund, established by section 9509 of Title 26.").

o If the Fund pays compensation to a claimant, it may seek recovery against the responsible party in place of the claimant. Id. § 2715 ("Any person, including the Fund, who pays compensation pursuant to this Act to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law.").

In this case, the NPFC designated GL NV24 the source of the discharge. Dkt. No. 109-2 at 1. GL NV24 accepted responsibility. Dkt. No. 89 at 10:18-23; see also 33 U.S.C. § 2714(b)(1). Thus, under the OPA, GL NV24 was required to "advertise the designation and the procedures by which claims may be presented, in accordance with regulations promulgated by the President." 33 U.S.C. § 2714(b)(1); 33 C.F.R. § 136.309.

Counsel for Vessel Defendants confirmed that GL NV24 issued the Public Notice. Dkt. No. 89 at 10:18-23. The Public Notice specified, in accordance with 33 U.S.C. Section 2714(b)(1), how and to whom claims should be presented:

> Claims should be in writing, signed by the claimant, for a specified amount; and should include all evidence to support the damages. Claims presented may include claims for interim short-term damages representing less than the full amount to which the claimant ultimately may be entitled. . . . Claims should be mailed to the following address:

> MR & Associates, LLC, 900 Rockmead Drive, Ste. 150, Kingwood, TX 77339.

Dkt. No. 109-2 at 1. The Vessel Defendants do not argue that Glynn County failed to follow the instructions in the presentment or that the other Vessel Defendants failed to receive notice of the presentment. See generally Dkt. No. 109; see also Dkt. No. 117-1 ("This [email] will confirm that we represent the owners and operators of the M/V GOLDEN RAY in connection with the September 8, 2019 capsize incident. We are in receipt of your June 4, 2021 letter written on behalf of Glynn County, Georgia.").

Because the County followed the procedure the designated responsible party set forth in its advertisement, it satisfied Section 2713(a). As discussed, Section 2713(a) requires presentment to the responsible party, but it does not state a procedure the presentment must follow. Under Section 2714(b)(1), the advertisement must state the "procedures by which claims *may* be presented." 33 U.S.C. § 2714(b)(1) (emphasis added). May means "[t]o be permitted" or "[t]o be a possibility." May, Black's Law Dictionary (11th ed. 2019); May, Oxford English Dictionary (2023) ("Expressing permission or sanction: be allowed (to do something) by authority, law, rule, morality, reason, etc."); May, Merriam Webster Unabridged (2023) ("[H]ave permission to: have liberty to."). Thus, the advertisement must state a procedure by which the claimant is permitted to present its claims and thereby satisfy Section 2713(a).

The Vessel Defendants' advertisement stated that claims "should be in writing, signed by the claimant, for a specified amount; and should include all evidence to support the damages." Dkt. No. 109-2 at 1. The advertisement further stated that claims "should be mailed to . . . MR Associates, LLC" at a particular address. Id. Accordingly, under Section 2713(b), a claimant *could* present its claims by following this procedure. And, as mentioned, Vessel Defendants do not contend that Glynn County failed to follow the instructions in the advertisement. Nothing in the advertisement required a claimant to individually address its claims to each responsible party, see generally dkt. no. 109-2 at 1, thus, that Glynn County did not individually address its claims to each Vessel Defendant does not make its presentment inadequate. Instead, because Glynn County followed a "procedure[] by which claims may be presented," it properly presented its claims. 33 U.S.C. § 2714(b)(1).

Vessel Defendants respond that "[t]he County's failure to present its claims to Hyundai Glovis and G-Marine cannot be excused by the fact that the Public Notice . . . identified only GL NV24" because "[u]nder the OPA, only the *source* of the discharge is required to be designated, not the responsible parties." Dkt. No. 109 at 10 (citing 33 U.S.C. § 2714(a) ("When the President receives information of an incident, the President shall, where possible and appropriate, *designate the source or sources* of the discharge

16

or threat." (emphasis added))). This argument ignores the responsible party's obligations.

33 U.S.C. Section 2714(a) sets forth the NPFC's responsibilities when a vessel discharges oil: to "designate the source or sources of the discharge or threat" and "immediately notify the responsible party and the guarantor, if known, of that designation." This does not absolve responsible parties of taking any actions. Rather, 33 U.S.C. Section 2714(a) sets forth the responsible parties' obligations. If, as in this case, the responsible party accepts the designation or fails to inform the NPFC of its denial within five days of receiving notification of the designation, the party "shall advertise the designation *and the procedures by which claims may be presented*, in accordance with regulations promulgated by the President." 33 U.S.C. § 2714(b)(1) (emphasis added). If a claimant could not successfully present its claims by following "the procedures by which claims may be presented" in the public notice, the advertisement requirement would be rendered surplusage. Id.; see Garcia v. Vanguard Car Rental USA, Inc., 540 F.3d 1242, 1247 (11th Cir. 2008) ("Another pertinent canon is the presumption against surplusage: we strive to give effect to every word and provision in a statute when possible." (citing Lowery v. Ala. Power Co., 483 F.3d 1184, 1204 (11th Cir. 2007))).

Thus, the Vessel Defendants' premise is false: the County did not "fail[] to present its claims to Hyundai Glovis and G-Marine," nor is it seeking to "excuse[]" a failure by pointing to the Public Notice. Dkt. No. 109 at 10. Instead, because Glynn County followed the presentment procedure set forth in the Public Notice—a "procedure[] by which claims may be presented," 33 U.S.C. § 2714(b)(1)—it presented its claims "first to the responsible party or guarantor of the source designated under [S]ection 2714(a) of [the OPA]," 33 U.S.C. § 2713(a).

The Vessel Defendants also argue that presentment to each responsible party is required because "courts have often recognized that a 'responsible party' designation is not dependent upon the source designation and public notice," instead, the "ultimate determination of which party or parties is a responsible party, within the meaning of 33 U.S.C. § 2702(a), is to be made by the court." Dkt. No. 109 at 11 (quoting Gabarick v. Laurin Mar. (Am.) Inc., No. CIV.A. 08-4007, 2009 WL 102549, at *4 n.25 (E.D. La. Jan. 12, 2009)). Contrary to the Vessel Defendants' assertion, that courts make the ultimate designation of which parties are responsible parties further supports that Glynn County's presentment was sufficient.

If the "procedures by which claims may be presented" in the public notice were not—despite the plain meaning of the phrase itself—sufficient to satisfy the OPA presentment procedure, under

the Vessel Defendant's logic, claimants would be required to undertake fact-intensive legal analyses to determine which parties are responsible parties and risk dismissal of all their claims if the court reaches a different conclusion. Instead, the plain meaning of Section 2714(b)(1)—that OPA claimants may satisfy the presentment requirement by following the procedures in the public notice—is consistent with the parties' respective access to information and the promotion of settlement negotiations.

Responsible parties are far more likely to have access to information about the cause of the oil discharge—and thereby whether they are, in fact, responsible parties—than a claimant. And the advertisement procedure encourages responsible parties to come forward at the outset of an oil discharge such that they can dictate how they would like claims to be presented. Holding as the Vessel Defendants desire would incentivize responsible parties to avoid advertisement or present misleading claim procedures in the hopes of having all claims against them dismissed for improper presentment. This would be directly contradictory to the OPA's purposes, "to enable the parties to negotiate, if possible, a settlement of potential claims resulting from an oil spill without having to resort to litigation." Johnson v. Colonial Pipeline Co., 830 F. Supp. 309, 311 (E.D. Va. 1993); see also Nguyen v. Am. Com. Lines LLC, 805 F.3d 134, 138 (5th Cir. 2015) (quoting Johnson, 830 F. Supp. at 310). Thus, the plain meaning of the text supports

that Glynn County satisfied the OPA presentment requirement by following the procedure stated in the public notice. This is bolstered by the specific purposes of the OPA's presentment procedure that other courts have recognized.

Finally, the Vessel Defendants argue that Section 2713 requires presentment to *each* responsible party since "Courts [must] strictly construe the presentment requirement [because the] OPA imposes a standard of strict liability on the responsible party for removal costs and damages caused by an OPA incident." Dkt. No. 120 at 3 (first citing 33 U.S.C. § 2702(a); and then citing Boca Ciega, 51 F.3d at 239). The Vessel Defendants continue, "[i]f a claimant seeks to benefit from the statute's strict liability standard, it must first strictly follow the statute's mandatory prerequisites." Id.

"[S]trictly constru[ing]" the presentment requirement, however, does not mean that Section 2713 requires presentment to each responsible party. Dkt. No. 120 at 3. Instead, for the reasons discussed supra, pp. 11-20, strictly construing Section 2713, a party must satisfy the presentment requirement, and it may do so by following the procedure set forth in the advertisement. Second, to the extent the Vessel Defendants' argument implies that the Court should impose the highest presentment burden that could be deduced from the text, this implication is incorrect because "we give undefined terms their plain, ordinary, and most natural

meaning" rather than their most burdensome meaning, even for statutes imposing strict liability. <u>Boca</u> Ciega, 51 F.3d at 237. Moreover, "Courts have long recognized that statutes, especially large, complex statutes like OPA, are the result of innumerable compromises between competing interests reflecting many competing purposes and goals." <u>Id.</u> at 238. "Therefore, 'vague notions' about a statute's overall purpose cannot be allowed 'to overcome the words of its text regarding the *specific* issue under consideration.'" <u>Id.</u> (quoting <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 261-62 (1993)); <u>see also</u> <u>S. Port Marine, LLC v. Gulf Oil Ltd. P'ship</u>, 234 F.3d 58, 65 (1st Cir. 2000) ("While we agree that such intentions were Congress's principal motivation in enacting the OPA, we think it would be naive to adopt so simpleminded a view of congressional policymaking in light of the competing interests addressed by the Act. . . . We think that the OPA embodies Congress's attempt to balance the various concerns at issue, and trust that the resolution of these difficult policy questions is better suited to the political mechanisms of the legislature than to our deliberative process.").

In sum, because the advertisement must state the "procedures by which claims *may* be presented," 33 U.S.C. § 2714(b)(1), and Glynn County followed the procedures in the Public Notice, Glynn County sufficiently presented its claims "first to the responsible party or guarantor of the source designated under [S]ection 2714(a)

of [the OPA]," 33 U.S.C. § 2713(a). Therefore, Glynn County's claims do not merit dismissal due to failure to present to each responsible party.

**B. Presentment of a sum certain**

33 U.S.C. Section 2713(a) provides, "all claims for removal costs or damages shall be presented first to the responsible party or guarantor of the source." 33 U.S.C. Section 2701(3) defines "claim" as "a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident." The OPA does not further define "sum certain."

As mentioned, "[i]t is axiomatic that the interpretation of a statute must begin, and usually ends, with the text of the statute." Boca Ciega, 51 F.3d at 237 (first citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992); and then citing United States v. Kirkland, 12 F.3d 199, 202 (11th Cir. 1994)). Again, "[w]hen interpreting the text, we give undefined terms their plain, ordinary, and most natural meaning." Id. (first citing Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995); and then citing Brown v. Gardner, 513 U.S. 115, 117–18 (1994)).

The plain and ordinary meaning of "sum certain" is a fixed amount of money. See Sum Certain, Black's Law Dictionary (11th ed. 2019) ("Any amount that is fixed, settled, or exact."); Sum and Certain, Merriam-Webster Unabridged (2023) (defining "sum" as "an indefinite or specific amount of money" and "certain" as "fixed,

22

settled, stated"); <u>Sum</u> and <u>Certain</u>, <u>Oxford English Dictionary</u> (2023) (defining "sum" as "[a] quantity or amount of money" and "certain" as "[d]etermined, fixed, settled; not variable or fluctuating; unfailing").

The question presented by this case is whether Glynn County satisfied the OPA's "sum certain" requirement by presenting damages amounting to $97,963,575.36 and explaining that this number was comprised of $116,233.84 in lost revenues and $165,814,010 in property damages, multiplied by four "to reflect future damages, expert expenditures, attorney's fees, miscellaneous costs/damages and punitive damages." Dkt. No. 109-1 at 3–5. It does.

The Vessel Defendants argue that the County did not present a "sum certain" because the amount alleged is a "a lump sum . . . that includes OPA and non-OPA related damages." Dkt. No. 109 at 12. This argument highlights the ambiguity within the "sum certain" requirement, even when interpreted according to its plain and ordinary meaning: does "a sum certain, for compensation for damages or removal costs resulting from an incident" require a party to list each type of OPA damages it seeks and a corresponding fixed amount of money? Or may a party satisfy the requirement by stating a fixed amount of money that includes all the damages or removal costs for which it seeks compensation—whether recoverable under the OPA, through other means, or not recoverable at all? Or does

the sum certain requirement fall somewhere in between or allow for some other presentment permutation?

Courts have looked to the Federal Tort Claims Act ("FTCA") for guidance in interpreting the OPA's "sum certain" requirement. See Honeywell Int'l Inc. v. Sunoco (R&M), LLC, No. 5:18-CV-1176(FJS/ML), 2022 WL 899524, at *2 (N.D.N.Y. Mar. 28, 2022); Honeywell Int'l Inc. v. Citgo Petroleum Corp., 574 F. Supp. 3d 76, 83 (N.D.N.Y. 2021); Nodine v. Plains All Am. Pipeline, L.P., No. 17-CV-163-SMY-DGW, 2018 WL 4636242, at *3 (S.D. Ill. Sept. 27, 2018). The FTCA, like OPA, requires claim presentment in the form of "a claim for money damages in a sum certain." 28 C.F.R. § 14.2(a); see also 28 U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the appropriate Federal agency."); 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency.").

In Sunoco, the District Court for the Northern District of New York evaluated the sufficiency of the plaintiff's OPA presentment based upon the Seventh Circuit's interpretation of the FTCA's sum certain standard. 2022 WL 899524, at *2. The Sunoco court explained,

> "OPA defines a 'claim' as 'a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident.'" "The OPA

24

does not define the term 'sum certain.' However, the
Seventh Circuit has addressed what is needed to satisfy
the requirements for a 'sum certain' in the context of
the Federal Tort Claims Act." "In <u>Khan v. U.S.</u>, 808 F.3d
1169, 1172-73 (7th Cir. 2015), the Court noted, 'all
that must be specified is "facts plus a demand for
money;" if those two things are specified, "the claim
encompasses any cause of action fairly implicit in the
facts."'" "'But as "facts plus a demand for money" must
be specified, failure to ask for any damages – any money
– is fatal.'"

<u>Id.</u> (citations omitted) (alterations accepted); <u>see also</u> <u>Citgo</u>,
574 F. Supp. 3d at 83 (same); <u>Nodine</u>, 2018 WL 4636242, at *3 (using
the "facts plus a demand for money" framework to evaluate whether
the plaintiffs presented a sum certain).

Like the Seventh Circuit's "facts plus a demand for money"
standard, the Eleventh Circuit has held that "[t]he FTCA's
[presentment] requirement is satisfied if the claimant '(1) gives
the agency written notice of his or her claim sufficient to enable
the agency to investigate and (2) places a value on his or her
claim.'" <u>Brown v. United States</u>, 838 F.2d 1157, 1160 (11th Cir.
1988) (quoting <u>Adams v. United States</u>, 615 F.2d 284, 289 (5th Cir.
1980)). The Eleventh Circuit "has taken a somewhat lenient approach
to the 'sum certain' requirement holding, for example, that even
where a claimant had not specifically stated the value of the
claim, attaching medical bills and repair estimates to the claim
notice could suffice." <u>Tidd v. United States</u>, 786 F.2d 1565, 1567
n.6 (11th Cir. 1986) (first citing <u>Molinar v. United States</u>, 515
F.2d 246 (5th Cir. 1975); and then citing <u>Wardsworth v. United</u>

*States*, 721 F.2d 503, 505-06 (5th Cir. 1983)); see also Molinar, 515 F.2d at 249 ("We are persuaded that plaintiff here has complied with the procedure for filing a claim. The letter of October 19, 1971, included bills which totaled $1462.50. This was a 'sum certain.' The testimony at trial by the reviewing officer that 'the figures here simply (gave) me no basis on which . . . to take any action' cannot overcome the presentation made by the bills themselves."); Dalrymple v. United States, 460 F.3d 1318, 1325 (11th Cir. 2006) (quoting Tidd, 786 F.2d at 1567 n.6); Turner ex rel. Turner v. United States, 514 F.3d 1194, 1200 (11th Cir. 2008).

"However, '[the Eleventh Circuit] ha[s] held that the FTCA requires, at a minimum, that a claimant expressly claim a sum certain or provide documentation which will allow the agency to calculate or estimate the damages to the claimant.'" Dalrymple, 460 F.3d at 1325 (quoting Suarez v. United States, 22 F.3d 1064, 1066 (11th Cir. 1994)). In Tidd, the Eleventh Circuit favorably cited Wardsworth, 721 F.2d at 505-06, for its "discussi[on of the] sum certain requirement, and indicat[ion] that it could be met by merely providing the agency with facts from which it could estimate the value of the claim." Tidd, 786 F.2d at 1567 n.6.

Here, Nodine, 2018 WL 4636242, at *3, is particularly on-point. The Nodine plaintiffs—residents of the local area—presented aggregate damages of $16,916,645, comprised of $8,069,145 in "socioeconomic" and "environmental" damages and $8,069,145 in

diminished property values. 2018 WL 4636242, at *2-3. The <u>Nodine</u>
plaintiffs "detailed how the oil spill affected land use, property
values, surface water and sediments, and soil and groundwater in
the Highland community." <u>Id.</u> at 3. While the OPA permits landowners
to recover damages for removal costs, 33 U.S.C. § 2702(b)(1)(B),
"injury to, or economic losses resulting from destruction of, real
or personal property . . . by a claimant who owns . . . that
property," <u>id.</u> § 2702(b)(2)(B), or subsistence use of natural
resources, <u>id.</u> § 2702(b)(2)(C), the OPA does not permit land-
owning claimants to recover damages for injury to natural
resources, costs of providing increased public services during
removal activities, or any other "socioeconomic" damages that do
not fall within Section 2702(b)'s specifically delineated
categories. Thus, like Glynn County, the <u>Nodine</u> plaintiffs'
presentment included both OPA and non-OPA damages in its
presentment and estimated damages amount. 2018 WL 4636242, at *3.
The <u>Nodine</u> court found the Seventh Circuit's FTCA "facts plus [a]
demand for money" standard "instructive" and held that the
presentment satisfied the OPA's sum certain requirement. <u>Id.</u> It
explained, "[w]hile Defendants requested more specificity
regarding Plaintiffs' claimed damages in subsequent letters, the
OPA merely requires claimants to 'present all claims and damages'
to the responsible party; the statute does not require claimants
to itemize damages individually." <u>Id.</u>

Similarly, Glynn County's presentment satisfies the OPA's
"sum certain" requirement, applying either the Eleventh Circuit's
notice "sufficient to enable investigat[ion]" plus a "value"
standard or the Seventh Circuit's "facts plus [a] demand for money"
standard. Glynn County's presentment, contrary to the Vessel
Defendants' assertion, does not simply state a "lump sum." Dkt.
No. 109 at 12. Instead, the County's 38-page presentment "described
how the [Golden Ray wreck] affected" local environment, local land-
and marine- traffic, loss of tax revenue, property damages,
"monitoring costs, disaster/emergency services response costs,
increased coastal cleanup/restoration expenditures, increased
marketing costs, and increased administrative costs." Dkt. No. 109
at 1-5. The County estimated loss of tax revenue valued at
$116,233.84 for the month following the spill and property damages
valued at $24,374,660.00 (comprised of $160,065,930 in damages to
parcels of land and $5,748,080 in damages to wetlands). Id. at 3-
4. Glynn County claimed total damages amounting to $97,963,575.36
and explained that the "figure . . . consists of past damages for
economic losses set forth herein, damages to its land and
wetlands/marshes set forth herein, and a multiplier of four to
reflect future damages, expert expenditures, attorney's fees,
miscellaneous costs/damages and punitive damages." Id. at 5. Like
the Nodine plaintiffs, this amount includes OPA and non-OPA
damages, but that is not fatal to the claims.

Like the <u>Nodine</u> presentment, Glynn County's presentment (1) provided the Vessel Defendants enough information to enable them to investigate the County's claims, and (2) provided a fixed amount of damages from which it was willing to begin settlement negotiations, as well as detail and documentation explaining how the sum was calculated. <u>Cf.</u> <u>Brown</u>, 838 F.2d at 1160 ("The FTCA's filing requirement is satisfied if the claimant '(1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim.'" (quoting <u>Adams</u>, 615 F.2d at 289)). This "permitted [the Vessel Defendants] to calculate or estimate the damages" it believed would comprise a fair settlement amount.  <u>Dalrymple</u>, 460 F.3d at 1325 (quoting <u>Suarez</u>, 22 F.3d at 1066).

While some of the damages Glynn County mentioned are not covered by the OPA, Defendants had a definite number from which they could begin settlement negotiations and sufficient detail to conduct their own estimation of the County's OPA claims if they so wished.  The OPA presentment procedure does not require more. Although Defendants may have wished for more "specificity regarding Plaintiffs' claimed damages in subsequent letters, the OPA merely requires claimants to 'present all claims and damages' to the responsible party; the statute does not require claimants to itemize damages individually." <u>Nodine</u>, 2018 WL 4636242, at *3; <u>see also</u> <u>Brown</u>, 838 F.2d at 1160.

29

The purpose of the OPA's presentment procedure further supports this conclusion. In Brown, 838 F.2d at 1160, the Eleventh Circuit explained that "[t]he congressional purposes of the [FTCA presentment] claim procedure are 'to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States.'" Id. (quoting Adams, 615 F.2d at 288). The court continued, "[a] 'claim' is not synonymous with a 'legal cause of action.'" Id. at 1161 (quoting Nelson v. United States, 541 F. Supp. 816, 818 (M.D.N.C. 1982)). Thus, "[c]ompelling a claimant to advance all possible causes of action and legal theories is 'overly technical' and may frustrate the purpose of [the presentment procedure]." Id. (quoting Mellor v. United States, 484 F. Supp. 641, 642 (D. Utah 1978)).

Several courts have recognized that Congress crafted the OPA presentment procedure "to promote settlement and avoid litigation," purposes very similar to those of the FTCA presentment procedure. Nguyen, 805 F.3d at 138 (quoting Johnson, 830 F. Supp. at 310); Abundiz v. Explorer Pipeline Co., No. Civ.A. 300CV2029H, 2003 WL 23096018, *3 (N.D. Tex. Nov. 25, 2003); Gabarick, 2009 WL 102549, at *3; Turner v. Murphy Oil USA, Inc., No. CIV.A. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007); Marathon Pipe Line, 944 F. Supp. at 479. The OPA, like the FTCA, requires claimants to present *claims* prior to filing suit, and, as the

30

Eleventh Circuit noted, "[a] 'claim' is not synonymous with a 'legal cause of action.'" Brown, 838 F.3d at 1161 (quoting Nelson, 541 F. Supp. At 818). Compelling an OPA claimant to specifically label each type of OPA damages sought and provide corresponding specific monetary valuations for each type of damages is "overly technical," id., and often extremely difficult, given that OPA events and their impacts often continue to unfold during the claims process and the specific types and values of damages often require expert analysis. Holding claimants to such high standards "may frustrate the purpose" of the OPA presentment procedure, by encouraging defendants to litigate a presentment's sufficiency rather than investigating the merit of the claimant's claims and seeking to reach a settlement. Id. at 1161. While "'vague notions' about a statute's overall purpose cannot be allowed 'to overcome the words of its text regarding the *specific* issue under consideration,'" as discussed, the OPA's text does not address the specific issue under consideration—what constitutes a "sum certain"—and relevant persuasive precedent also supports that Glynn County's presentment included a "sum certain." Boca Ciega, 51 F.3d at 238 (quoting Mertens, 508 U.S. at 261–62).

Vessel Defendants cite Sunoco, 2022 WL 899524, at *3, and Citgo, 574 F. Supp. 3d at 83–84, for the proposition that a "claimant cannot present a lump sum amount which includes both OPA and non-OPA damages." Dkt. No. 109 at 9. In Sunoco and Citgo, the

courts applied the "facts plus a demand for money" standard and found the plaintiffs' presentments inadequate. Sunoco, 2022 WL 899524, at *2–3; Citgo, 574 F. Supp. 3d at 83–84. The presentments failed to mention the "OPA anywhere in the document" and "provide[d] a sum, . . . [but] [d]id not indicate how [the] sum would be allocated between the various types of claims—CERCLA, OPA, and state law—that [the] [p]laintiff assert[ed] against [the] [d]efendants." Sunoco, 2022 WL 899524, at *3.

In contrast, Glynn County's presentment repeatedly invoked the OPA. As discussed supra, pp. 25–31, it also satisfied the "facts plus a demand for money" standard. While the Sunoco and Citgo presentments did not "indicate" how the sums were allocated, the Glynn County presentment explained how the sum was calculated and provided enough detail to allow the Vessel Defendants to conduct their own investigation and valuation.

Other cases where courts have found presentments lacking are similarly distinguishable. In Johnson, 830 F. Supp. at 311, the presentment "d[id] not give any suggestions as to the amount of damages they are claiming." Here, Glynn County's presentment claimed a specific amount and explained how it was calculated. In Abundiz, 2002 WL 2030880, at *3–4, the court held that the plaintiffs "failed to allege a sum certain for the damages sustained by any of the [p]laintiffs" because the plaintiffs' stipulation and settlement offer contained different amounts. Id.

at *4. "[T]he settlement offer [was] in excess of the stipulation," so the defendant "could not have negotiated meaningfully with the [p]laintiffs." Id. Here, Glynn County's presentment provided enough detail and uncontradicted monetary estimates such that the Vessel Defendants could have negotiated meaningfully.

At bottom, Glynn County's presentment comports with the OPA's text, satisfies the Eleventh Circuit and Seventh Circuit FTCA "sum certain" standards, and is consistent with the OPA's purpose. Therefore, the Vessel Defendants' argument that the presentment is insufficient for presenting a lump sum with both OPA and non-OPA damages fails.

### C. Presentment of all claims

The Vessel Defendants next argue that the presentment fails because Glynn County asserts claims in the Second Amended Complaint that it does not raise in the presentment. Dkt. No. 109 at 12. According to the Vessel Defendants, "the County only included a description of the nature and extent of damages for two specific categories of OPA damages: (1) reduction in revenue and (2) property damages." Id. "The County's Second Amended Complaint, however, also asserts that the County sustained damages related to lost profits and earning capacity and increased public services." Id. (citing Dkt. No. 96 ¶¶ 66–67). The County responds that the presentment "included lost profits and earning capacity (manifested by reduced revenues) and increased public services

(manifested through such miscellaneous damages as disaster and emergency services and administrative costs)." Dkt. No. 117 at 14.

For the reasons discussed <u>supra</u>, pp. 25-32, a claimant is not required to specifically label each type of OPA damages sought. So long as the presentment "specifie[s]" "facts plus a demand for money," "the claim encompasses any cause of action fairly implicit in the facts." <u>Sunoco</u>, 2022 WL 899524, at *2 (first quoting <u>Khan</u>, 808 F.3d at 1172-73; and then quoting <u>Nodine</u>, 2018 WL 4636242, at *3); <u>Citgo</u>, 574 F. Supp. 3d at 83 (quoting <u>Khan</u>, 808 F.3d at 1172-73) (same). Thus, the Court must examine whether damages related to lost profits and earning capacity, as well as damages related to increased public services, are "fairly implicit" in the County's presentment. <u>Sunoco</u>, 2022 WL 899524, at *2 (quoting <u>Nodine</u>, 2018 WL 4636242, at *3)  They are.

In its presentment letter, the County explained, "[t]he following are some of the damages that have been sustained to date with the expectation of others developing as the salvage of the *Golden Ray* continues:

    (a)       Reduction of County Revenues/Tax Base;

    (b)       Property Damages;

    (c)       Punitive damages;

    (d)       Investigative Costs; and

    (e)       Miscellaneous Costs." Dkt. No. 109-1 at 1-2.

Under the sub-heading "Reduction of County Revenues," the County explained that it engaged a consultant "to calculate the fiscal impacts from the Golden Ray spill." Id. at 3. It continued,

> [The consultant's] opinions were based on historical benchmark methodology because the loss of revenue was primarily based on taxes and lacked variable elements. After establishing a benchmark period, he extrapolated the amount of loss the County suffered during the immediate aftermath of the Golden Ray spill.
>
> Based on his analysis, the loss of revenue experienced by the County as a result of the Golden Ray in the months following the disaster is equal to $116,233.84. The true loss associated with this incident has been camouflaged by the impacts of the Covid-19 Pandemic. As the vessel continues to sit along the coast and is severed into pieces for removal, we can only expect these losses to mount considering that the negative impacts of the COVID pandemic have begun to fade while the impacts of the M/V Golden Ray continue to linger. Please see the report of [the consultant] attached hereto for further details.

Id. at 3–4. The County also attached the report created by the consultant. Id. at 6–38. Under the sub-heading "Miscellaneous Costs/Damages," Glynn County wrote: "[i]n addition to those expenditures listed above, the County is and/or is expected to incur monitoring costs, disaster/emergency services response costs, increased coastal cleanup/restoration expenditures, increased marketing costs, and increased administrative costs." Id. at 5.

Damages for lost profits and earning capacity are "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal

property, or natural resources," and these damages "shall be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E). In contrast, damages for lost revenues are "[d]amages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources," and these damages "shall be recoverable by the Government of the United States, a State, or a political subdivision thereof." Id. § 2702(b)(2)(D).

For a local government, damages for lost revenues may overlap with damages for lost profits and earning capacity. This overlap is caused by the way local governments earn profits. Local governments earn profits, at least in part, through means such as "taxes, royalties, rents, fees, or net profit shares." Id. § 2702(b)(2)(E). Both types of damages also require that a claimant suffer losses "due to the injury, destruction, or loss of real property, personal property, or natural resources." Id. § 2702(b)(2)(D), (E). The expert report highlights the overlapping nature of the two types of damages, explaining that the expert chose to estimate "an analysis of lost revenue, as opposed to lost variable profit" because "the revenue streams in question are generally tax revenues and lack a direct cost of goods sold. In addition, the other expenses generally associated with these revenue streams are more closely related to fixed expenses rather than variable costs." Dkt. No. 109-1 at 9.

36

Because the presentment included facts related to "the fiscal impacts [on the County] from the Golden Ray spill," including lost taxes that comprise a portion of the County's profits and earnings, damages for lost profits and earning capacity are "fairly implicit" in Glynn County's presentment. Sunoco, 2022 WL 899524, at *2 (first quoting Khan, 808 F.3d at 1172–73; and then quoting Nodine, 2018 WL 4636242, at *3); Citgo, 574 F. Supp. 3d at 83 (quoting Khan, 808 F.3d at 1172–73). That a governmental entity may claim both damages for lost profits and earning capacity, as well as damages for lost revenues, is supported by the statutory text; the statute provides that damages for lost profits and earning capacity "shall be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E).

Similarly, the County includes public services damages in its presentment, even though it does not explicitly label them as "public service damages." See Dkt. No. 109-1 at 5. Public services damages are "[d]amages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State." 33 U.S.C. § 2702(b)(2)(F). As the County notes, dkt. no. 117 at 14, these damages are included in its "Miscellaneous Costs/Damages" portion of its presentment, dkt. no. 109-1 at 5. The County mentions "monitoring costs," "disaster/emergency services response costs," "coastal

cleanup/restoration expenditures," and "administrative costs."
Dkt. No. 109-1 at 5. These costs could all qualify as "public
services" damages under 33 U.S.C. Section 2702(b)(2)(F). Thus, a
claim for public services damages is "fairly implicit" in Glynn
County's presentment. Sunoco, 2022 WL 899524, at *2 (first quoting
Khan, 808 F.3d at 1172-73; and then quoting Nodine, 2018 WL
4636242, at *3); Citgo, 574 F. Supp. 3d at 83 (quoting Khan, 808
F.3d at 1172-73). As a result, Glynn County has sufficiently
presented its claims for lost profits and earning capacity and
public services damages.

Because Glynn County's presentment contained a "sum certain"
and facts implicating all the categories of OPA damages it brings
in its Second Amended Complaint, it satisfied the OPA's presentment
requirement. The Vessel Defendants' motion to dismiss, dkt. no.
109, is therefore **DENIED** as to Glynn County's OPA claim.

## II.  Displacement and preemption

While "'[p]reemption' and 'displacement' are often used
interchangeably," they are distinct concepts. United States v. Am.
Com. Lines, LLC, 759 F.3d 420, 422 n.1 (5th Cir. 2014). Indeed,
some of the cases cited herein use these terms interchangeably.
However, "preemption refers to whether federal statutory law
supersedes state law, while 'displacement' applies when . . . a
federal statute governs a question previously governed by federal
common law." Id. The Vessel Defendants' argument implicates

displacement: whether the OPA displaces Glynn County's federal maritime negligence claim. Dkt. No. 109 at 15-16 ("[B]ecause the County alleges federal maritime claims against responsible parties for oil-spill liability based on an OPA incident and response, under Eleventh Circuit precedent, those claims are preempted by OPA and must be dismissed with prejudice."). In contrast, Norton Lilly's argument implicates both displacement and preemption: whether the OPA or federal maritime law preempts Glynn County's state-law claims and whether the OPA displaces federal maritime law. Dkt. No. 104 at 4-6.

**A. Vessel Defendants' arguments**

The Vessel Defendants argue that the OPA displaces the County's federal maritime negligence claim and "its claims for trespass and private nuisance . . . to the extent they are based on federal common law." Dkt. No. 109 at 16; see also Dkt. No. 89 at 36:11-13 ("[W]e are not taking the position today that the state law claims must be dismissed because of application of OPA."). Notably, Glynn County states it brings its claims for trespass, public nuisance, and private nuisance under state—not federal—law. Dkt. No. 117 at 4 n.3; Dkt. No. 89 at 32:6-12. Thus, the Court will evaluate only whether the OPA displaces the County's federal maritime negligence claim. Dkt. No. 96 ¶¶ 76-79, 85, 88-90. Because the OPA's "detailed scheme . . . [displaces] the general oil-removal remedies that might've been available under . . . the

common law," Savage Servs. Corp. v. United States, 25 F.4th 925, 939 (11th Cir. 2022), Glynn County's federal maritime negligence claim is displaced.

In Savage, the Eleventh Circuit examined whether the OPA was exclusive and—by extension—whether the plaintiffs could pursue removal costs and damages by bringing common-law admiralty claims under the Suits in Admiralty Act ("SAA"). 25 F.4th at 938. The court held the OPA was exclusive. Id. at 939. The court explained, "where Congress enacts a specific remedy when previous remedies were 'problematic,' the remedy provided is generally regarded as exclusive." Id. (alterations accepted) (quoting Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 285 (1983)).). The court continued,

> And that's pretty much what happened here. In 1990, Congress enacted a detailed—and precisely drawn—statute that governed almost every aspect of an oil-spill cleanup. . . . Congress didn't draw up this carefully balance design—a veritable super-structure of oil-cleanup rights, duties, and obligations—for no reason. It did it to strike the right incentives within the oil industry itself—incentives the previous regime had, in Congress's estimation, failed to drive home. *This detailed scheme thus preempts the general oil-removal remedies that might've been available under either the common law or the SAA.*

Id. (emphasis added).

Glynn County argues that "[t]he issue in Savage was not whether the OPA preempts maritime claims but whether the OPA provided a waiver of sovereign immunity so that a claimant could

pursue removal costs from the United States. Its rationale and holding have no bearing on the County's maritime claims here for non-OPA provided remedies." Dkt. No. 117 at 15. The County is correct that *one of* the issues in <u>Savage</u> was "whether the OPA provided a waiver of sovereign immunity so that a claimant could pursue removal costs against the United States." <u>Id.</u>; <u>Savage</u>, 25 F.4th at 933-36. The court held that it did not. <u>Savage</u>, 25 F.4th at 933-36.

But the court did not end its analysis there. Next, the court examined whether the OPA was exclusive, such that, "even if the OPA may not *itself* contain a waiver of sovereign immunity, vessel owners may still go after the United States for removal costs and damages by bringing common-law admiralty claims against the Government pursuant to the SAA's sovereign-immunity waiver." <u>Id.</u> at 938. The court held that the OPA was exclusive, so the vessel owners could not pursue common-law admiralty claims against the Government. <u>Id.</u> at 938-44. This holding is directly applicable to this case, where Glynn County—like the <u>Savage</u> claimants—seeks to bring a common-law maritime claim for removal costs and damages against the Vessel Defendants. As the <u>Savage</u> court held, the OPA's "detailed scheme . . . preempts the general oil-removal remedies that might've been available under . . . the common law." <u>Id.</u> at 939. Because the <u>Savage</u> court held that "a federal statute governs a question previously governed by federal common law," it was using

the word "preemption" interchangeably with the word "displacement." Am. Com. Lines, LLC, 759 F.3d at 422. Thus, the Savage court held that the OPA displaces federal common-law oil removal remedies. Glynn County's federal maritime negligence claim is therefore displaced by the OPA. Savage, 25 F.4th at 939; see also S. Port Marine, 234 F.3d at 65 ("[W]e note that, although the parties have referred to this issue as one of 'preemption,' it does not present any of the federalism concerns normally associated with that word, because we are concerned only with the OPA's effect on preexisting *federal* law. The question, therefore, is not complicated by any 'presumption against preemption,' but is rather a straightforward inquiry into whether Congress intended the enactment of the OPA to supplant the existing general admiralty and maritime law, which allowed punitive damages under certain circumstances in the area of oil pollution. We conclude that Congress did so intend." (citations omitted)).

Glynn County further argues that Savage's holding was "narrow" because the Savage court held that "every maritime plaintiff—except for an oil spiller—'has the same rights' after the OPA as it did before." Dkt. No. 117 at 15 (quoting Savage, 25 F.4th at 948). This argument overlooks the Savage court's black-letter holding that the OPA is exclusive and displaces other federal-common law oil removal remedies. The argument also ignores some of the language it quotes. The Savage court held "every

maritime plaintiff—*except for an oil spiller*—'has the same rights' after the OPA as it did before." Id. (emphasis added). Here, the Vessel Defendants are responsible parties, colloquially the "oil spillers."

The Savage court explains why this is in detail. The OPA contains a "notwithstanding" clause, which states:

> *Notwithstanding any other provision or rule of law*, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) that result from such incident.

Savage, 25 F.4th at 941 (quoting 33 U.S.C. § 2702(a)). The court explained that "a 'notwithstanding' clause is 'Congress's indication that the statute containing that language is intended to take precedence over any preexisting or subsequently-enacted legislation on the same subject,'" and "context . . . supports [the court's] reading of the OPA's exclusivity." Id. (quoting Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs, 619 F.3d 1289, 1298 (11th Cir. 2010)).

The OPA also contains a "savings clause." Id. "It reads: 'Except as otherwise provided in this Act, this Act does not affect admiralty and maritime law.'" Id. (alteration accepted) (quoting 33 U.S.C. § 2751(e)). This does not mean that all federal common-

law claims related to oil-spill removal and damages survive. Instead,

> the fact is that the OPA *has* "provided otherwise." The OPA is a detailed and comprehensive framework for apportioning oil-spill liability. Through its many parts, Congress chose *not* to afford vessel owners any cause of action against the United States. Quite the contrary: It eliminated, as we've said, a provision—present in the OPA's predecessor statute—that would've allowed vessel owners to skirt liability in the case of governmental negligence. And it strayed from similar statutory schemes (like CERCLA and RCRA) that expressly allow for contribution claims against the federal government. The plain import of these unambiguous decisions, then, is that Congress *has* provided otherwise—by making clear that the Government is *not* liable for oil-removal costs.

Id.; see also Am. Com. Lines, 759 F.3d at 426. ("As OPA did 'otherwise provide[ ],' ACL's claims against ES & H and USES for return of payments made by the Fund under OPA cannot be saved by this clause. To interpret § 2751(e) as ACL proposes would be to supersede OPA, and courts cannot, without any textual warrant, expand the operation of savings clauses to modify the scope of displacement under OPA." (citation omitted)); In re Settoon Towing, LLC, 859 F.3d 340, 351 (5th Cir. 2017) ("The . . . language [in the OPA savings clause] shows that the admiralty claims that are preserved are those that are not addressed in the OPA. . . . The contribution that is being sought in this case is addressed in the OPA. Marquette's view of the interplay between Section 2709 and Section 2751 would transform the 'savings clause' into a supremacy clause by advancing general maritime law over the express

provisions of the OPA."); Gabarick v. Laurin Mar. (Am.) Inc., 623
F. Supp. 2d 741, 746 (E.D. La. 2009) (hereinafter Gabarick II)
("Claimants refer to the savings provision as a basis for their
argument that OPA is a supplemental rather than exclusive avenue
for the damages it covers. However, Claimants' memoranda ignores
the first part of section (e)—'except as otherwise provided in
this Act.' . . . The Act also uses the absolute words 'all' and
'shall,' stating that '*all* claims for . . . damages *shall* be
presented first to the responsible party,' and allows for suit
after exhaustion of the claims process as outlined in § 2713(c).
33 U.S.C. § 2713 (emphasis added). Hence, the plain language of
the statute indicates its mandatory and exclusive nature with
respect to its covered damages.").[3]

---

[3] Glynn County cites Gabarick II, 623 F. Supp. 2d at 750, to support
that the OPA does not preempt or displace its claims. Dkt. No. 113
at 8. According to the County, Gabarick II supports that "the
County was entitled to bring its OPA and non-OPA claims into this
Court *because the administrative procedures had already been
exhausted.*" Id. This would be true for any claims not displaced or
preempted by the OPA. However, because Glynn County's maritime
negligence claim is displaced by the OPA, the County may not now
bring it simply because it has exhausted the OPA's administrative
procedures. In Gabarick II, the court recognized that "[c]laimants
should pursue claims covered under OPA *only* against the responsible
party," and "once claimants have exhausted the OPA administrative
remedies, they are then entitled, under the statutory language
expressed in OPA, to pursue their claims in federal court." 623 F.
Supp. 2d at 750. In the context of discussing the procedures by
which a claimant may assert its OPA claims, it is clear the
Gabarick II court meant that the claimants could pursue their *OPA
claims* in federal court, as provided by the statute, not federal
maritime claims that are otherwise displaced by the OPA.

The OPA has similarly "provided otherwise" as to responsible parties such as the Vessel Defendants. The OPA provides claimants a pathway to hold responsible parties strictly liable for removal costs and damages that result from an oil discharge. 33 U.S.C. § 2702(a). Thus, because the OPA "*has* 'provided otherwise'" as to oil-spill liability, the OPA displaces Glynn County's federal maritime negligence claim.

Glynn County next argues that, even if the OPA displaces its federal maritime negligence claim as to responsible parties, "any federal common law claims that the Court determines to be displaced by the OPA for a responsible party shall remain in place for parties deemed non-responsible parties under the terms of the OPA." Dkt. No. 117 at 16 (citations omitted). This argument fails for the same reason. The OPA "*has* 'provided otherwise'" as to non-responsible parties. Savage, 25 F.4th at 941. "Through its many parts, Congress chose *not* to afford" claimants a cause of action against non-responsible parties. Instead, it compensates claimants through strict liability against the responsible parties. The responsible parties, in turn, may seek recovery from non-responsible parties. See 33 U.S.C. §§ 2702(d)(1)(B), 2709. Because the OPA "*has* 'provided otherwise'" as to claims for oil removal costs and damages against non-responsible parties, even if one of the Vessel Defendants were found to be non-responsible parties,

Glynn County may not bring a federal common law claim against them for oil removal costs and damages.

Next, in oral argument, Glynn County argued that its federal maritime claim survives as to recovery for debris—rather than oil—resulting from the Golden Ray wreck and wreck recovery efforts. Dkt. No. 89 at 33:9-24 ("[T]here's debris and car parts that were, you know everywhere. And so it's not just an oil discharge. It's more than that, and I think that, at least on the face of the complaint at this stage of the complaint, we should be able to hold onto maritime law claims potentially there as well with regard to any of the debris that would have damaged the property of the County—not oil so the OPA wouldn't apply—but debris."). These debris include materials such as car parts and hazardous fluids from the vessel. Id.; Dkt. No. 96 ¶¶ 41, 47, 52. These materials do not fit within the OPA's definition of oil, which it defines as

> oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil, but does not include any substance which is specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601) and which is subject to the provisions of that Act [42 U.S.C. 9601 et seq.].

33 U.S.C. 2701(23).

However, despite its name, the OPA provides for recovery of more than just oil removal and damages directly caused by oil discharge. The text shows this in three ways. 33 U.S.C. Section

2702(a) states: "each responsible party for a vessel . . . from which oil is discharged, or which poses the substantial threat of a discharge of oil, . . . is liable for the removal costs and damages specified in subsection (b) that result from such incident." Id.

First, the OPA provides for removal costs and damages that "result from such incident," not removal costs and damages caused by the oil discharge. Id. Thus, rather than limiting recovery solely to the "discharge of oil," the OPA uses broader language, expanding recovery to "costs and damages . . . that result from such an incident." 33 U.S.C. § 2702(a); In re Settoon, 859 F.3d at 351 ("[C]ourts cannot, without any textual warrant, expand the operation of savings clauses to modify the scope of displacement under OPA." (quoting Am. Com. Lines, 759 F.3d at 426)). "Such incident" refers to a situation where a vessel discharges oil or there is a substantial threat that a vessel will discharge oil. 33 U.S.C. § 2702(a). As a result, the text covers more than simply recovery for damages directly attributed to oil, such as other damages caused by the incident which led to the discharge of oil or the substantial threat of oil discharge. And this makes sense considering that Congress intended the OPA to be a "detailed—and precisely drawn—statute [to] govern[] almost every aspect of an oil-spill cleanup," providing strict liability rather than dealing with the "fragmented collection of Federal and State laws providing

inadequate cleanup and damage remedies." Savage, 25 F.4th at 930, 939 (quoting S. Rep. No. 101-94 at 3 (1989)).

Second, under the plain language of the statute, the OPA adheres (1) when a vessel discharges oil, like the Golden Ray did in this case, or (2) when there is a "substantial threat of discharge of oil." Id. Thus, the OPA may adhere *even when there is no oil discharge* but only a substantial threat of oil discharge. Under Glynn County's logic, even though the OPA would adhere when there is a "substantial threat of discharge of oil," a claimant could not recover under OPA because there would be no actual discharge of oil. In other words, it would render that part of Section 2702(a) superfluous. See Garcia, 540 F.3d at 1247 ("Another pertinent canon is the presumption against surplusage: we strive to give effect to every word and provision in a statute when possible." (citing Lowery, 483 F.3d at 1204)).

Third, when the OPA adheres, it provides strict liability for all "removal costs and damages specified in subsection (b) that result from such incident." 33 U.S.C. § 2702(a). The "removal costs and damages specified in subsection (b)," id., are not limited to oil remediation and removal, id. § 2702(b).

The OPA covers "all removal costs incurred by the United States, a State, or an Indian tribe under subsection (c), (d), (e), or (l) of section 1321 of this title, under the Intervention on the High Seas Act (33 U.S.C. 1471 et seq.), or under State law"

49

and "any removal costs incurred by any person for acts taken by
the person which are consistent with the National Contingency
Plan." Id. § 2702(b)(1); see also Matter of Complaint of Supreme
Towing Co., Inc., No. CV 07-9231, 2010 WL 11561150, at *14 (E.D.
La. Aug. 12, 2010) ("'The OPA imposes strict liability for
pollution removal costs and damages' on 'responsible parties' *when
there is a discharge of oil in navigable water*. Numerous courts
have held that the OPA, where applicable, preempts the Limitation
Act and general maritime law." (emphasis added) (citations
omitted)). 33 U.S.C. Sections 1321(c), (d), (e), and (l) involve
the "removal of a discharge and mitigation or prevention of a
substantial threat of a discharge, of oil or a hazardous
substance," the preparation of a National Contingency Plan for
removal of oil and hazardous substances, civil enforcement, and
administration of the statutory section. "Hazardous substance" is
defined as "any substance designated pursuant to subsection (b)(2)
of this section." 33 U.S.C. § 1321(a)(14). Section (b)(2)(A)
provides that "[t]he Administrator shall develop, promulgate, and
revise as may be appropriate*, regulations designating as hazardous
substances, other than oil as defined in this section*, such
elements and compounds which, when discharged in any quantity into
or upon the navigable waters of the United States . . . present an
imminent and substantial danger to the public health or welfare,
including, but not limited to, fish, shellfish, wildlife,

50

shorelines, and beaches." 33 U.S.C. § 1321(b)(2) (emphasis added).
Thus, discharge of a "hazardous substance," a recoverable cost
under Section 2702(b)(1), includes substances "other than oil." 33
U.S.C. § 1321(b)(2)(A).

The National Contingency Plan, similarly, permits removal of
materials besides oil. 40 C.F.R. Section 300.415(b) states: "At
any release, regardless of whether the site is included on the
National Priorities List (NPL), where the lead agency makes the
determination . . . that there is a threat to public health or
welfare of the United States or the environment, the lead agency
may take any appropriate removal action to abate, prevent,
minimize, stabilize, mitigate, or eliminate the release or the
threat of release."

Moreover, only one of the six delineated categories of OPA
damages mentions damages "caused by a discharge of oil." Id.
§ 2702(b)(F) (defining public services damages as "[d]amages for
net costs of providing increased or additional public services
during or after removal activities, including protection from
fire, safety, or health hazards, *caused by a discharge of oil*,
which shall be recoverable by a State, or a political subdivision
of a State." (emphasis added)). The other five categories make no
mention of oil discharge, so they permit damages "result[ing] from
[an] incident" where there was oil discharge or a threat of oil
discharge, even if the damages themselves were not caused by the

discharge of oil. 33 U.S.C. Section 2702(a); id. §§ 2702(b)(A)-(E) (defining natural resource damages as "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage"; defining real or personal property damages as "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage"; defining subsistence use damages as "[d]amages for loss of subsistence use of natural resources"; defining revenues damages as "[d]amages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources"; defining profits and earning capacity as "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources.").

Limiting recoverable damages only to those directly caused by oil discharge would also raise a plethora of issues. For example, it would raise claim- and litigation- costs for both the claimants and the responsible parties as further expert analysis would be required to determine whether certain damages were caused by oil discharge or some other discharge from the damaged vessel. Moreover, several discharges could have concurrent effects. For example, where natural resources such as local marine life are

harmed by a wreck, it could be extremely difficult, if not nearly impossible, to precisely attribute how much the oil discharge damaged the local marine life versus how much discharge of car parts and other hazardous substances damaged the marine life. While this apportionment issue could possibly be resolved, it would undoubtedly complicate, elongate, and raise the expenses of OPA proceedings in a way that is not reflected by the text of the statute and does not serve to "promote settlement and avoid litigation." Nguyen, 805 F.3d at 138 (quoting Johnson, 830 F. Supp. at 310).

Thus, applying 33 U.S.C. Section 2702(a) to this case, the OPA covers the non-oil debris Glynn County seeks to recover. The non-oil debris Glynn County mentions in its Second Amended Complaint were all discharged as a part of the Golden Ray wreck removal efforts. In the Second Amended Complaint's factual allegations, Glynn County's only mention of "discharges of debris and hazardous fluids" pertains to those that "occurred *throughout the duration of the wreck* removal." Dkt. No. 96 ¶ 52 ("Repeated fires causing discharges of debris and hazardous fluids occurred throughout the duration of the wreck removal."). Dkt. No. 96 ¶¶ 41 ("After the capsizing and rescue, thousands of gallons of fuel, mixed with water, was pumped out by December 12, 2019, while thousands of gallons of petroleum products, hazardous substances, and the 4,161 vehicles *remained*." (emphasis added)); id. ¶ 47

("T&T's Wreck Removal Plan indicated that the limited number of large cuts would reduce the potential of inaccessible and un-pumpable hydrocarbons and other pollutants from impacting waters surrounding the wreck removal site, and the EPB would provide a protective barrier along the seabed, throughout the water column and at the surface level allowing for the retention and recovery of debris and other pollutants."). Thus, discharge of debris and hazardous fluids resulted from the wreck of the Golden Ray ("such incident") and subsequent remediation efforts. 33 U.S.C. § 2702(a). They are therefore covered by the OPA, and the responsible parties are strictly liable for the removal costs and damages.

Lastly, Glynn County argues that its maritime negligence claim is not displaced because "the maritime negligence alleged by the County involves actions taken by the Vessel Defendants as the respective owner, charterer, operator, and technical superintendent of the [Golden Ray] before it had a chance to leave the dock at Colonel Island in the Port of Brunswick." Dkt. No. 117 at 17. But Glynn County brings its maritime negligence claim to recover damages that occurred *because of* "a vessel . . . from which oil [was] discharged, or which pose[d] the substantial threat of discharge of oil." 33 U.S.C. § 2702(a); see also Dkt. No. 96 ¶¶ 76-79, 85, 88-90 ("It is also foreseeable that improper calculation of vessel stability could result in the vessel capsizing and

causing an oil spill"; "It is also foreseeable that vessel instability could result in the vessel capsizing and causing an oil spill"; "It is also foreseeable that improper calculation of vessel stability could result in the vessel capsizing and causing an oil spill"; "It is also foreseeable that vessel instability could result in the vessel capsizing and causing an oil spill"; "[Vessel Defendants and Norton Lilly's] breaches were the cause or a substantial factor in causing the capsizing and resultant oil spill and environmental and economic harm to Glynn County"; "[T&T] . . . caused several fires . . . and several oil spills, . . . releasing oil and other hazardous fluids into the St. Simons Sound and surrounding environment"; "The measures [T&T] implemented to contain the oil and other flammable, hazardous and toxic substances repeatedly failed, and as a result, the County has suffered harm from the discharges of additional repeated oil, fuel and other hazardous substances from [T&T's] activities"; "The additional injuries sustained by the County as a result of these repeated events were the direct and proximate result of [T&T's] failure to properly contain the oil and other flammable, hazardous and toxic substances of and in the ship.").

That actions taken before the vessel left the Port of Brunswick caused the discharge of oil and other hazardous substances does not change the fact that the County is seeking to recover damages due to "a vessel . . . from which oil [was]

discharged, or which pose[d] the substantial threat of discharge of oil," which the OPA covers. 33 U.S.C. § 2702(a). "Congress didn't draw up this carefully balanced design—a veritable super-structure of oil-cleanup rights, duties, and obligations—for no reason. It did it to strike the right incentives within the oil industry itself—incentives the previous regime had, in Congress's estimation, failed to drive home." Savage, 25 F.4th at 939. Plaintiffs benefit greatly from this regime—they can hold defendants strictly liable for damages—but they may not seek to recover twice for the same damages under both the OPA and federal common law. Thus, Glynn County's claim for federal maritime negligence is displaced by the OPA, and the Court **GRANTS** the Vessel Defendants' motion to dismiss as to the federal common law claim.

### B. Norton Lilly's arguments

Glynn County asserts claims for federal maritime negligence, state-law public nuisance, state-law private nuisance, and state-law trespass. Dkt. No. 96 ¶¶ 74-140. For the same reasons discussed supra, pp. 40-58, the OPA displaces Glynn County's federal maritime negligence claim against Norton Lilly. Thus, Norton Lilly's motion to dismiss, dkt. no. 104, is **GRANTED** as to Glynn County's federal maritime negligence claim.

Norton Lilly, unlike the Vessel Defendants, also argues that Glynn County's state law claims merit dismissal. Dkt. No. 104 at 4-13. According to Norton Lilly, the OPA, as a comprehensive

56

federal law apportioning oil-spill liability, is exclusive and
prohibits Glynn County from asserting related claims under any
other legal theories. Id. at 4-6. Moreover, Norton Lilly argues
that the state-law claims fail on the merits. Id. at 7-13. Neither
argument succeeds.

   i.   **Preemption**

   Norton Lilly's first argument involves preemption because
Norton Lilly is arguing that a "federal statutory law supersedes
state law." Am. Com. Lines, LLC, 759 F.3d at 422; Dkt. No. 104 at
4-6 (arguing that the OPA exclusively applies to oil spill
liability, to the prohibition of other sources of liability). In
making this argument, Norton Lilly seemingly presumes all Glynn
County's claims are governed by federal maritime law or that
federal law preempts Glynn County's state-law claims. See Dkt. No.
116 at 1-5 (analyzing whether the OPA displaces federal maritime
causes of action); Dkt. No. 104 at 4-6 (arguing that the OPA
precludes all Glynn County's claims). Glynn County, however,
properly alleges three state law claims. The OPA, although the
"exclusive" *federal* "source of liability for oil-removal claims,"
does not preempt Glynn County's *state*-law claims. Dkt. No. 104 at
5 (quoting Savage, 25 F.4th at 940).

   Federal law in general and federal maritime law in particular
can be exclusive, but it can also apply concurrently with state
law. See, e.g., Kossick v. United Fruit Co., 365 U.S. 731, 739

(1961) ("[T]he fact that maritime law is—in a special sense at least—federal law and therefore supreme by virtue of Article VI of the Constitution carries with it the implication that wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing and significant. *But the process is surely rather one of accommodation*, entirely familiar in many areas of overlapping state and federal concern, or a process somewhat analogous to the normal conflict of laws situation where two sovereignties assert divergent interests in a transaction as to which both have some concern." (emphasis added) (citation omitted)); Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623, 631 (1st Cir. 1994) ("We hold, then, that the Rhode Island's Compensation Act as reasonably construed and applied is not preempted by the admiralty clause of the Constitution."); Kodiak Island Borough v. Exxon Corp., 991 P.2d 757, 769 (Alaska 1999) ("Because the *Robins* rule is not a 'characteristic feature' of admiralty and the application of Alaska law will not unduly interfere with the harmony and uniformity of the admiralty system, we hold that federal law does not preempt enforcement of the damages provisions of Alaska's hazardous substances statutes."). Here, Glynn County's claims are properly pled under Georgia state law because the Golden Ray wreck occurred within Georgia's territorial waters. Dkt. No. 96 ¶¶ 1, 24 ("[T]he [Golden Ray] . . . capsized at St. Simons Sound."); Dowis

v. Mud Slingers, Inc., 621 S.E.2d 413, 415-16, 419 (Ga. 2005)
(explaining that Georgia's choice of law for torts is "lex loci
delicti," which means "where the tort was committed"). Thus, the
question becomes whether this is one of the cases where a plaintiff
in an oil-spill case may assert both state and federal law claims,
even though the state claims seem duplicative. It is.

Courts and commentators have recognized that federal maritime
preemption doctrine is difficult. See, e.g., Thomas J. Schoenbaum,
Admiralty and Maritime Law § 4:4 (6th ed.) ("The issue of
federalism in admiralty and the scope of application of state law
in maritime cases is one of the most perplexing issues in the
law."); Steven R. Swanson, Federalism, the Admiralty, and Oil
Spills, 27 J. Mar. L. & Com. 379, 379-80 (1996) ("The federalism
issues created by civil damages suits brought by private litigants
have received less attention than they deserve. The *Exxon Valdez*
disaster showed that a major oil spill can implicate both federal
and state laws. Plaintiffs claiming harm from the spill brought
actions under state and federal law in both legal systems. The
resulting liability questions centered on the interaction of
federal general maritime law, federal statutory law, state common
law, and state statutory law. This collection of remedies caused
a great deal of confusion and controversy. After years of
Congressional inaction, the magnitude of the problems presented in
the *Exxon Valdez* case led to the passage of the [OPA] which

continued to allow the application of state law *without fully clarifying how federal and state law were to interact*." (emphasis added) (footnote omitted)); William R. Gignilliat, <u>The Gulf Oil Spill: OPA, State Law, and Maritime Preemption</u>, 13 Vt. J. Envtl. L. 385, 388 (2011) ("The doctrine [governing maritime preemption] has not been applied clearly in the past."). As one court noted, "[d]iscerning the law in this area is far from easy; one might tack a sailboat into a fog bank with more confidence." <u>Beach Shellfish</u>, 32 F.3d at 624. When faced with this issue, courts generally apply the <u>Jensen</u>[4] test to determine whether maritime law preempts state law. <u>See, e.g.</u>, Gignilliat, <u>supra</u>, at 409–15 (discussing how the <u>Jensen</u> test could apply during an oil spill); <u>MBH Mar. Int. LLC v. Manteiga</u>, No. 17-61909-CIV, 2018 WL 1363844, at *5 (S.D. Fla. Mar. 15, 2018) (explaining and applying the <u>Jensen</u> test).

Caselaw analyzing when plaintiffs' state-law claims are preempted in OPA cases have yielded different results and rationales. <u>See</u> Gignilliat, <u>supra</u>, at 404–05; <u>Sekco Energy</u>, 820 F. Supp. at 1013 (holding that federal maritime law preempted state law because federal maritime law "applie[d] 'of its own force'" (quoting <u>Union Tex. Petroleum v. PLT Engineering</u>, 895 F.2d 1043, 1047 (5th Cir. 1990))); <u>Williams v. Potomac Elec. Power Co.</u>, 115

---

[4] <u>S. Pac. Co. v. Jensen</u>, 244 U.S. 205 (1917).

F. Supp. 2d 561, 564-65 (D. Md. 2000) (relying upon United States v. Locke, 529 U.S. 89 (2000), to find that "OPA does not preempt 'state laws of a scope similar to the matters contained in Title I of OPA,' such as the state common law actions pleaded here"); Dostie Dev., Inc. v. Arctic Peace Shipping, Co. Inc., No. 95-808-CIV-J-MMP, 1996 WL 866119, at *3 (M.D. Fla. Aug. 14, 1996) (relying upon 33 U.S.C. Section 2718(a)(2) to find that the OPA did not preempt the plaintiffs' common law negligence claim); Nat'l Shipping Co. of Saudi Arabia v. Moran Trade Corp. of Del., 122 F.3d 1062, 1146-49 (4th Cir. 1997) (holding that the OPA preempted state law claims by a plaintiff who was initially designated the responsible party to recover expenses against the third party who was the sole cause of the spill); Isla Corp. v. Sundown Energy, LP, No. CIV.A. 06-8645, 2007 WL 1240212, at *2 (E.D. La. Apr. 27, 2007) (finding no preemption by relying on a removal case, Tanguis v. Westchester, 153 F. Supp. 2d 859, 863 (E.D. La. 2001), where the court noted that a group of commentators observed "that the OPA 'does not preempt state law in the area of oil spill liability and compensation'"); Mid-Valley Pipeline Co. v. S.J. Louis Const., Inc., 847 F. Supp. 2d 982, 990 (E.D. Ky. 2012) (applying conflict preemption analysis and holding that the OPA preempted the plaintiff's state-law claim for indemnification because it conflicted with the OPA but that the OPA did not preempt the plaintiff's contribution claim because it did not conflict); see

also In re Deepwater Horizon, 745 F.3d 157, 171 (5th Cir. 2014) (analyzing preemption of state-law claims under the OPA and CWA and holding that "[f]ederal law, the law of the point source, exclusively applies to the claims generated by the oil spill in any affected state or locality, [but] [p]reemption is limited to situations in which the affected state is not the point source jurisdiction; affected states may still pursue relief based on the OPA and the CWA or the law of the point-source"); In re Oil Spill by Oil Rig "DEEPWATER HORIZON" the Gulf of Mexico, on Apr. 20, 2010, No. 10-3059, 2011 WL 5520295, at *8 (E.D. La. Nov. 14, 2011) (state law claims related to an oil spill that occurred outside of state territorial waters were preempted under the OPA and CWA).

At first glance, the resolution of the issue in this case seems clear. See, e.g., Dkt. No. 113 at 9–10 ("The OPA expressly preserves state-law claims, stating that nothing in the Act preempts state law liability for 'the discharge of oil or other pollution by oil." (quoting 33 U.S.C. § 2718(a)) (collecting cases)); Cynthia M. Wilkinson et. al., Slick Work: An Analysis of the Oil Pollution Act of 1990, 12 J. Energy Nat. Resources & Envtl. L. 181, 221 (1992) ("[T]he OPA explicitly does not preempt state law in the area of oil spill liability and compensation."). 33 U.S.C. Section 2718(a) provides:

Nothing in this Act or the Act of March 3, 1851 shall—

(1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

    (A) the discharge of oil or other pollution by oil within such State; or

    (B) any removal activities in connection with such a discharge; or

(2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.

But Norton Lilly's argument—seemingly framing the issue as one of state law preemption by federal maritime common law, which is then displaced by the OPA—raises pertinent questions. By not "affect[ing]" the authority of states or modifying liabilities, the OPA could have preserved the authority of the states as it was before its enactment—that is, courts should apply Jensen and other preemption analyses to determine whether a plaintiff's state-law claims are preempted by federal maritime law, which, in turn, the OPA displaces. Cf. Wilkinson et al., supra, at 222–23 ("While attempts were made during negotiations to include language that specified what areas were preempted and what areas were not, the Senate was leery of doing so."). Or, as in Mid-Valley Pipeline, 874 F. Supp. 2d at 990, the OPA may still impliedly preempt state law that provides conflicting remedies and liability for oil pollution. Or, 33 U.S.C. Section 2718(a) removes the Jensen test

or other preemption tests from the analysis, permitting *any* state common law claims that also impose liability for oil spills. These different interpretations explain the different analyses courts have conducted regarding this issue. Compare Williams, 115 F. Supp. 2d at 565 and Dostie Dev., 1996 WL 866119, at *3, with Sekco Energy, 820 F. Supp. at 1013 and Mid-Valley Pipeline, 874 F. Supp. 2d at 990.

Given the text of 33 U.S.C. Section 2718(a), persuasive authority, and indications of Congressional intent, the Court follows the latter analysis and finds that Section 2718(a) permits Glynn County's state-law claims. As noted, the phrase "[n]othing in this Act . . . shall . . . affect," as used in Section 2718(a), is subject to multiple interpretations—that is, (1) to not change from what it was prior to the OPA's enactment, retaining the status quo, or (2) to remove any impediments. Given that Section 2718(a) expressly mentions "imposing . . . *additional liability*" and "obligations or liabilities under . . . State law, *including common law*"—and that the state common law causes of action in this case would impose additional liability—the second interpretation seems most likely. Moreover, that Congress chose to include not only the word "affect" but also "construed or interpreted as preempting" or "construed or interpreted to affect or modify in any way" indicates a strong intent to preserve duplicative or overlapping state law, including state common law, causes of

64

action. See also Wilkinson et. al., supra, at 222–23 ("Section
[2718] of the OPA makes clear that states may impose additional
requirements regarding oil spill liability, removal activities,
penalties and fines, and oil spill trust funds.").

United States v. Locke supports this. 229 U.S. at 104–06. In
Locke, the Supreme Court held that Washington's regulations
governing the operation of oil tankers were preempted by federal
law, reasoning that the OPA's savings clauses "may preserve a
State's ability to enact laws of a scope similar to Title I, but
do not extend to subjects addressed in the other titles of the Act
or other acts." Id. The Court explained, "[i]n contrast to the
Washington rules at issue . . . , Title I does not regulate vessel
operation, design, or manning." Id. at 105. It concluded, "[t]he
evident purpose of the savings clauses is to preserve state laws
which, rather than imposing substantive regulation of a vessel's
primary conduct, establish liability rules and financial
requirements relating to oil spills." Id. "Our view of [the] OPA's
savings clauses preserves this important role for States, which is
unchallenged here." Id. at 106. Thus, while the Court's decision
involved laws outside of Title I's scope, the Court strongly
suggested that the OPA's savings clauses preserved state laws "of
a similar scope to Title I," which imposes liability related to
oil discharge or threats of oil discharge. Section 2718(a)(2)
clarifies that "State law" includes "common law," such as the

causes of action in this case. Other OPA cases that considered whether a plaintiff may bring state-law liability claims have also adopted this view. See Williams, 115 F. Supp. 2d at 565; Dostie Dev., 1996 WL 866119, at *3; Isla Corp, 2007 WL 1240212, at *2; see also Gignilliat, supra, at 406; Wilkinson et. al., supra, at 221.

Importantly, this does not prevent other federal statutes, such as the CWA, from preempting state-law claims imposing additional liability for oil discharge or threats of oil discharge. Cf. In re Deepwater Horizon, 745 F.3d at 172–73 ("[T]he OPA was designed to complement, not compete with the CWA. That the OPA was enacted more recently than the CWA means little where there is no fundamental conflict with provisions of the CWA. The statutes, in other words, must be construed, as the district court noted, in *pari materia*." . . . Thus, while Section 2718(c) saves from the OPA's diminution the ability of the United States or state entities to impose requirements relating to oil discharges, it does not save those powers from the effects of the CWA or any other non-identified federal law.). However, no CWA claim is before the Court, and neither party argues that the CWA or another federal statute impacts preemption in this case, so the Court will not address that issue. Therefore, as the case currently stands before the Court, Glynn County's state law claims are not preempted

because 33 U.S.C. Section 2718(a) permits Glynn County's state-law claims.

### III. State law claims

Norton Lilly argues that, even if maritime law and the OPA do not preempt Glynn County's state law causes of action, they fail on the merits. Dkt. No. 104 at 7–15.[5] When evaluating a motion to dismiss, the Court must "accept all factual allegations in a complaint as true[,] and take them in the light most favorable to [the] plaintiff[.]" Dusek v. JPMorgan Chase & Co., 832 F.3d 1243, 1246 (11th Cir. 2016). "Legal conclusions without adequate factual support are entitled to no assumption of truth," and a motion to dismiss "is granted only when the movant demonstrates that the complaint has failed to include 'enough facts to state a claim to relief that is plausible on its face.'" Id. (alterations accepted) (first citing Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011); and then quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Each of Glynn County's state law causes of action is properly pled.

### A. Public and private nuisance

Norton Lilly argues that Glynn County's public and private nuisance causes of action fail because Norton Lilly did not own or

---

[5] Norton Lilly also argues that Glynn County's maritime negligence claim fails on the merits. Dkt. No. 104 at 7–10. As mentioned, supra p. 58, this cause of action is displaced by the OPA. Therefore, the Court need not address this argument.

control the nuisance. Dkt. No. 104 at 10–11. As both parties recognize, "the essential element of nuisance is control over the *cause* of the harm." <u>Fielder v. Rice Const. Co.</u>, 522 S.E.2d 13, 16 (Ga. Ct. App. 1999) (emphasis added); Dkt. No. 104 at 10; Dkt. No. 113 at 15.

However, there may be multiple causes of a single harm; "[t]he tortfeasor must be either the cause or *a concurrent cause of the creation,* continuance, or maintenance of the nuisance." <u>Fielder</u>, 522 S.E.2d at 16 (emphasis added); <u>Sanders v. Henry Cnty.</u>, 484 F. App'x 395, 399 (11th Cir. 2012); Dkt. No. 113 at 15. Glynn County alleges:

- Norton Lilly's port captain developed the preliminary stowage plan arrangement indicating where the vehicles would be loaded on the vessel, otherwise known as the load plan or stowage plan. Hyundai Glovis's operations manager reviewed the stowage plan for large-scale view of the layout and Norton Lilly conducted the space calculations, with each vehicle's detailed specifications. Dkt. No. 96 ¶ 33.

- Norton Lilly developed the final load plan that included the actual load conditions, including the number, the estimated weight, and the stowage location of vehicles on each deck. <u>Id.</u> ¶ 34.

- Norton Lilly provided the final load plan, or floor plan, to the stevedores who provided a handwritten plan of the cargo that was put on board the vessel prior to departure. Id. ¶ 35.

- [Norton Lilly] was [the] agent for the [Golden Ray], and its port captain developed the stowage plan for the entire vessel, including the space calculations on each deck, with each vehicle's detailed specifications, which resulted or contributed to the vehicles being loaded in a top-heavy manner contributing to the vessel's capsizing and consequent oil spills. It is foreseeable to the agent of the vessel that an executed stowage plan that results in a top-heavy loading profile would result in vessel instability. It is also foreseeable that vessel instability could result in the vessel capsizing and causing an oil spill. Id. ¶ 97.

Thus, drawing inferences in favor of Glynn County, as the Court must do at this stage, Glynn County alleges that Norton Lilly controlled the creation of the nuisance; it controlled "stowage plan for the entire vessel . . . which resulted in . . . the vehicles being loaded in a top-heavy manner contributing to the vessel's capsizing and consequent oil spills." Id.

Norton Lilly argues that it did not control the Golden Ray because, as the ship's agent, it "acted at the direction of and on behalf of the ship, not vice versa." Dkt. No. 104 at 11. But, inferring in Glynn County's favor, Norton Lilly had control over

the load plans, which were the cause or a concurrent cause of the Golden Ray's capsize. Dkt. No. 96 ¶¶ 33-35, 97. Norton Lilly urges that control lies with "the crew, acting on behalf of one or more of the vessel defendants, who operated and control the ship, and are responsible for its voyage." Dkt. No. 104 at 11 (citing Dkt. No. 96 ¶¶ 30-31, 36-37, 59). While Glynn County's allegations against other Defendants indicate that they may also have exercised some control over the creation, continuance, or maintenance of the nuisance, this does not prevent Norton Lilly's actions from being a concurrent cause of the nuisance. Discovery will clarify this issue, but on a motion to dismiss, the Court must "accept all factual allegations in a complaint as true[,] and take them in the light most favorable to [the] plaintiff[.]" Dusek, 832 F.3d at 1246. In doing so, Glynn County has sufficiently alleged that Norton Lilly was a cause of the nuisance. Therefore, Norton Lilly's motion to dismiss, dkt. no. 104, is **DENIED** as to Glynn County's public and private nuisance claims.

### B. Trespass

Norton Lilly argues that Glynn County's trespass claim fails because it has "not alleged that Norton Lilly, or anything belonging to it or which it controlled, entered onto its property." Dkt. No. 104 at 11-12. "[A] trespass generally involves a wrongful act that interferes with an owner's right to the exclusive use and enjoyment of his property." Petree v. Dep't of Transp., 798 S.E.2d

70

482, 490 (Ga. Ct. App. 2017). As with public and private nuisance, Glynn County alleges that Norton Lilly controlled the load plans. Dkt. No. 96 ¶¶ 33-35, 124-25; Dkt. No. 113 at 17-19. Inferring in Glynn County's favor, Norton Lilly committed a wrongful act by incorrectly creating these plans. This wrongful act resulted in the vessel having "too many vehicles placed at a high center of gravity," and ultimately causing its capsize and the discharge of oil and other pollutants onto Glynn County's property. Dkt. No. 96 ¶¶ 33-35, 39, 124-25. Thus, Glynn County properly alleges trespass—that Norton Lilly's wrongful act interfered with Glynn County's property rights. Cf. Roughton v. Thiele Kaolin Co., 74 S.E.2d 844, 847 (Ga. 1953) (the defendant's pollution of a stream entering the plaintiff's property could constitute a trespass). As a result, Norton Lilly's motion to dismiss, dkt. no. 104, is **DENIED** as to Glynn County's trespass claim.

**CONCLUSION**

Because Glynn County properly presented its OPA claims to the Vessel Defendants, the Vessel Defendants' motion to dismiss, dkt. no. 109, is **DENIED** as to Glynn County's OPA claim. Since the OPA displaces Glynn County's federal maritime negligence claim against the Vessel Defendants, the Vessel Defendants' motion to dismiss, dkt. no. 109, is **GRANTED** as to that claim. As the Vessel Defendants do not seek dismissal of Glynn County's state-law claims, these claims remain pending.

71

Further, Norton Lilly's motion to dismiss, dkt. no. 104, is **DENIED**. Glynn County's state-law claims for public nuisance, private nuisance, and trespass against Norton Lilly are not preempted, and Glynn County states a claim as to each of these causes of action.

**SO ORDERED** this 1st day of September, 2023.

_____

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA